## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| SULTAN BZEIH, an individual, BRUNO MORABITO and ANTONIA MORABITO, married individuals, SAMIR ALLEY, an individual, ALI SROUR, an individual, 1817 VERNON, LLC, a Michigan limited liability company, EMPIRE REALTY MANAGEMENT, LLC, a Michigan limited liability company, XEROLA MANAGEMENT, LLC, a Michigan limited liability company, 3313 DETROIT, LLC, a Michigan limited liability company, 3833 BREWSTER LLC, a Michigan limited liability company, and KORTE PROPERTY, LLC, a Michigan limited liability company, | ) Case No. 26-cv-_____ ) ) ) ) ) ) (Hon._____) ) ) ) ) ) ) ) |
| Plaintiffs, | ) COMPLAINT ) |
| v. | ) ) |
| CITY OF DEARBORN, a Michigan municipal corporation, | ) ) ) |
| Defendant | ) ) |

## COMPLAINT

**COME NOW** Plaintiffs, Sultan Bzeih, Bruno Morabito, Antonia Morabito, Samir Alley, Ali Srour, 1817 Vernon, LLC, Empire Realty Management, LLC, Xerola Management, LLC, 3313 Detroit, LLC, 3833 Brewster, LLC and Korte Property, LLC (collectively "Plaintiffs"), by and through their undersigned counsel, and for their Complaint against Defendant, City of Dearborn ("Defendant" or the "City"), state as follows:

### INTRODUCTION

1.     This lawsuit challenges a City ordinance that targets short-term rentals lasting less than 30 days. That ordinance arbitrarily and capriciously bans the use of the subject properties

(and all other properties in residential zoning districts) as short-term rentals despite the historical approval of such use of the properties by the City and deprives property owners in the City of their fundamental rights to lease the property and their right to include others on the property, in direct conflict with the Takings Clause of the U.S. Constitution.

2.      Since time immemorial, property has determined how people have transacted with one another and has governed the terms of social interactions. And for as long as society has enforced property rights, owners have tapped into the value of their properties – and, in particular, their homes – by opening them up for temporary use and enjoyment of others, including in exchange for compensation.

3.      The ancient tradition of homeowners renting all or part of their homes to travelers needing a place to stay for short or long periods took hold on this side of the Atlantic too. *See, e.g.*, Jamila Jefferson-Jones, *Airbnb and the Housing Segment of the Modern Sharing Economy: Are Short-Term Rental Restrictions an Unconstitutional Taking*, 42 Hastings Const. L.Q. 557, 561-63 (2015); *see also, e.g., Faw v. Marsteller*, 6 U.S. (2 Cranch) 10 (1804).

4.      It is thus no surprise that the U.S. Constitution, which draws on "traditional property law principles" and "historical practice," protects a private property owner's rights to lease and to include others on the property, which allows the owner to realize the full value of her property. *Tyler v Hennepin Cnty.*, 598 U.S. 631, 638 (2023).

5.      As the Supreme Court stated long ago, the right to lease is an "essential attribute[]" of property," *Terrace v Thompson*, 263 U.S. 197, 215 (1923), and one of those "fundamental rights which are the essence of civil freedom," *The Civil Rights Cases*, 109 U.S. 3, 22 (1883).

6.      Relatedly, the Supreme Court emphasized that a property owner's "right to exclude" others from the property is "the '*sine qua non*' of property." *Cedar Point Nursery v*

2

*Hassid*, 594 U.S. 139, 149-50 (2021) (quoting Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730, 730 (1998)). The "right to exclude" (*i.e.*, the right to deny access) "encompass[es]" the "right to include" *(i.e.,* the right to grant access), Merrill, *Property and the Right to Exclude, supra*, at 742-43, and one traditional way in which property owners include others on the property is through leasing arrangements, of short and long durations.

7.     Accordingly, when the government appropriates the right to lease or the right to include, the Takings Clause of the Fifth Amendment requires the government to "pay for what it takes" – just as it must when it appropriates any other "fundamental element of the property right" or "essential stick[] in the bundle of rights that are commonly characterized as property." *Cedar Point Nursery*, 594 U.S. at 148, 150. And these constitutional protections apply not only when the government "interfere[s]" with and thereby appropriates homeowners' right to lease or otherwise share their homes on a *long*-term basis, *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 274 (2024), but on a *short*-term basis too, as "[t]he duration of an appropriation … bears only on the amount of compensation," *Cedar Point Nursery*, 594 U.S. at 153.

8.     Notwithstanding the historical tradition supporting short-term rentals and the robust protections under the Takings Clause that are afforded the right to lease and the right to include, the City took the extraordinary step in July 2025 of enacting Ordinance No. 25-1845 (the "STR Ordinance"). The STR Ordinance prohibits homeowners within City limits from renting any room in their homes for a period of less than 30 days in exchange for compensation.

9.     The STR Ordinance is manifestly unconstitutional. When a property owner exercises their rights to lease and to include, they not only decide to offer their property for another to use, but also determine how long the other party may stay. The City's STR Ordinance, however, empowers the City to decide the appropriate length of time that an owner may open

3

their property to a guest and thus indisputably interferes with the owner's right to lease the property as well as the owner's right to include others on it. By appropriating such essential incidents of property ownership, the City as effected *per se* takings, which requires the City to provide affected homeowners just compensation under the Takings Clause. See *Cedar Point Nursery*, 594 U.S. at 148-50.

10.    At a bare minimum, the STR Ordinance amounts to a regulatory taking under the multi-factor balancing test set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). In fact, if the City's destruction of such fundamental property right somehow survives that ad hoc balancing test, it would mean that the time has come for the Supreme Court to overrule *Penn Central*.

11.    That said, the Supreme Court should not have to take such steps here. In the end, there is no question that, through the STR Ordinance, Dearborn has sought to "forc[e] some people alone" (*i.e.*, homeowners like Plaintiffs) "to bear public burdens" (*i.e.*, refraining from exercising fundamental property rights to accommodate the purported public interest in limiting short-term guests in the City) that, "in all fairness and justice, should be borne" and paid for "by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). The Constitution leaves no uncertainty in that context: The affected property owners are "entitle[d]" to "just compensation" for shouldering that burden themselves. *Id.*

12.    Plaintiffs thus seek declaratory relief, injunctive relief, and damages to remedy the City's constitutional and statutory violations and to vindicate the fundamental rights of homeowners.

## THE PARTIES

13.    Plaintiff Sultan Bzeih owns and manages the property located at 3827

Brewster, Dearborn, MI 48120.

14.     Plaintiffs Bruno and Antonia Morabito (collectively the "Morabitos") co-own and manage the properties located at 14957 Prospect Street, Dearborn, MI 48126 and 15017 Prospect St, Dearborn, MI 48126.

15.     Plaintiff Samir Alley owns and manages the properties located at 14390 Barclay Street, Dearborn, MI 48126, 18124 Audette Street, Dearborn, MI 48126, and 14381 Robertson Street, Dearborn, MI 48126.

16.     Plaintiff Ali Srour owns and manages the property located at 3840 Brewster, Dearborn, MI 48120.

17.     Plaintiff 1817 Vernon, LLC, is a Michigan limited liability company that owns the property located at 1817 N Vernon, Dearborn, MI 48128, within the City of Dearborn.

18.     Plaintiff Empire Realty Management, LLC is a Michigan limited liability company that owns the property located at 1937 Hollywood, Dearborn, MI 48124, within the City of Dearborn.

19.     Plaintiff Xerola Management, LLC is a Michigan limited liability company that owns the property located at 3130 Roosevelt, Dearborn, MI 48124, within the City of Dearborn.

20.     Plaintiff 3313 Detroit, LLC is a Michigan limited liability company that owns the property located at 3756 Brewster, Dearborn, MI 48120 within the City of Dearborn.

21.     Plaintiff 3833 Brewster, LLC is a Michigan limited liability company that owns the property located at 3833 Brewster, Dearborn, MI 48120 within the City of Dearborn.

22.     Plaintiff Korte Property, LLC is a Michigan limited liability company that owns the property located at 4750 Korte St., Dearborn, MI 48126 within the City of Dearborn.

23.     The properties identified in paragraphs 13 through 22 above shall be collectively

referred to herein as "Plaintiffs' Properties."

24.     Defendant City of Dearborn is a municipal corporation organized and existing under the laws of the State of Michigan and located in Wayne County, Michigan.

## JURISDICTION AND VENUE

25.     This action is brought under 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the U.S. Constitution. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States and under 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the deprivation, under of color of the ordinances of the City of Dearborn, of rights, privileges or immunities secured by the United States Constitution.

26.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202, and 1343, and by Rules 57 and 65 of the Federal Rules of Civil Procedure

27.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' claim under Michigan law because that claim arises from a common nucleus of related facts and are so inextricably intertwined with the federal claims within the original jurisdiction of this Court that they form part of the same case or controversy.

28.     Venue is proper in this district under 28 U.S.C. §1391(b) because the Defendant resides in this district, a substantial part of the events giving rise to this action occurred, and will continue to occur, in this judicial district; and the properties that are the subject of this action are situated in this judicial district.

## FACTS

### A. The Right to Lease and the Right to Include.

29.     The right to lease one's home is a fundamental incident of property ownership

6

with deep historical roots. Indeed, the practice of leasing one's property to others long predates the founding of this Nation.

30.     The lease traces its origins back to the *locatio conductio* of Roman law. *See* Sally Brown Richardson, *Reframing Ameliorative Waste*, 65 Am. J. Comp. L. 335, 348 (2017). Through this Roman legal arrangement, a property owner "transferred to the tenant the [] use and enjoyment of the leased premises." Melissa T. Lonegrass, *Convergence in Contort: Landlord Liability for Defective Premises in Comparative Perspective*, 85 Tul. L. Rev. 413, 435 (2010).

31.     Similarly, under the early English common law, property owners sold others "uses," which allowed owners to convey property temporarily to another person who would care for and manage it. Avisheh Avini, *The Origins of the Modern English Trust Revisited*, 70 Tul. L. Rev. 1139, 1143-45 (1996).

32.     These arrangements, like the modern lease that followed them, represented key property innovations, as they not only created an avenue for an owner to reap the benefits of ownership but also enabled capital-poor members of society to access and develop the value of the property that they leased. "Roman leases were, at their core, business arrangements, be they residential, agricultural, or commercial in nature." Richardson, *supra*, at 349. And as Blackstone observed, the possessory interest that lessees obtained from the common-law-protected leasehold estate "encourage[d] them" to "cultivate the ground." 2 W. Blackstone, Commentaries on the Laws of England 141 (1766).

33.     In the United States, Americans in the early Republic likewise recognized the underlying value of their properties and understood that they could reap substantial economic benefits by treating their "living space as a [] [valuable] exchange commodity." David Faflik, *Boarding Out: Inhabiting the American Literary Imagination*, 1840-60, at 40 (2012). As a result,

they routinely turned to leasing, especially in the housing context. *See* Jefferson-Jones, *supra*, at 561-63 (detailing the practice of early Americans using their homes to host boarders on a short-term basis).

34.     That much is reflected in early state and U.S. Supreme Court caselaw, which frequently addressed the rights and responsibilities associated with leases. *See, e.g., Pelletreau v. Jackson ex dem. Varick*, 11 Wend. 110 (N.Y. Sup. Ct. 1833) (discussing a rental property leased to tenants beginning around 1782 or 1783); *Herbert v. Wren*, 11 U.S. (7 Cranch) 370 (1813) (describing the size of a woman's dower estate in the rents recovered from property leased in 1794); *Alexander v. Harris*, 8 U.S. (4 Cranch) 299 (1808) (landlord's action to recover rent); *Faw*, 6 U.S. (2 Cranch) 10 (adjudicating a debt action to recover rent on a lease created in 1779).

35.     In the first half of the 19th century, the leasehold grew in popularity as Americans began to exercise the fundamental property right to lease their properties on a short-term basis, largely through week-to-week tenancies. *See, e.g., Curley v. Dean*, 4 Conn. 259 (1822) (discussing a weekly tenancy); *Jackson ex dem. Russell v. Rowland*, 6 Wend. 666 (N.Y. Sup. Ct. 1831) (noting that a dwelling-house tenant held a weekly tenancy); *Reeves v. Dougherty*, 15 Tenn. (7 Yer.) 222 (1834) (noting that a building lessee also boarded with the defendants via a weekly tenancy).

36.     This trend continued into the late-19th and early-20th centuries, underscoring the historically grounded tradition of short-term leasing in the United States. *See, e.g., Horton v. Handvil*, 3 A. 72 (N.J. Ch. 1886) (discussing a weekly rental of a house); *Sherlock v. Thayer*, 4 Mich. 355 (1856) (describing a weekly tenancy created by plaintiff's renting his property to defendant); *Tondro v. Cushman*, 5 Wis. 279 (1856) (same); *see also Raymond v. Strickland*, 52 S.E. 619 (Ga. 1905) (suit involving a week-to-week rental property).

37.     Those pronouncements about the fundamental rights that an owner holds by virtue of property ownership comports with the U.S. Supreme Court's long-established understanding that the "right to ... lease" is an "essential attribute[] of property." *Terrace*, 263 U.S. at 215.

38.     In the century since *Terrace*, the U.S. Supreme Court has protected property rights in other related ways. In 2021, the Supreme Court explained in *Cedar Point Nursery* that "the right to exclude is 'universally held to be a fundamental element of the property right,' and is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" 594 U.S. at 150. Citing scholarship from Professor Thomas Merrill, the Court emphasized that the right to exclude is "the '*sine qua non*' of property." *Id.* at 149 (quoting Merrill, *Property and the Right to Exclude, supra,* at 730). As Professor Merrill's scholarship in turn explains, "the right to exclude" is "simply a gatekeep power" - *i.e.*, "the right to determine who has access to particular resources and on what terms." Merrill, *Property and the Right to Exclude, supra*, at 740 n.37. As a result, "the right to exclude must encompass ... the owner's right to include others." *Id.* at 742-43 (emphasis added).

39.     As detailed above, a primary way in which property owners have historically included others on their property is by exercising their right to lease, including on a short-term basis. Leasing arrangements are therefore doubly protected through their right to lease and the right to include.

**B.  The Growth of the Short-Term Rental Market and Approval of Short-Term Rentals by the City.**

40.     Over the last two decades, the popularity of short-term rentals in the United States has skyrocketed, in large part because of digital platforms like Airbnb. By 2023, "[t]he U.S. short-term rental market reached $64 billion," with 785,000 hosts participating and guests collectively spending some 207 million nights. Jamie Lane, *2023 Short Term Rental Statistics*

*You Need to Know*, AirDNA (Jan. 28, 2024), https://tinyurl.com/3xdmka56.

41.     Those hosts included property owners who participated in the short-term-rental market in Michigan generally and southeast communities such as Dearborn in particular.

42.     The ability to offer short-term rentals benefits Dearborn property owners and guests alike: Owners realize an economic return for the use of their land and provide guests with the opportunity to stay in a home while temporarily working in or near the community, visiting friends or relatives who reside in the community, or visiting the many Dearborn area cultural venues.     The short-term rentals in Dearborn also provide options for travelers looking to stay in the area that is centrally located between downtown Detroit to the east and the Detroit Metropolitan Airport and Ann Arbor to the west.

43.     Consistent with the nationwide, state and regional growth of the short-term rental market, Plaintiffs have successfully converted all of Plaintiffs' Properties into short-term rental units and secured all necessary approvals from the City for such use.

44.     In order to lawfully rent a home to any occupant, the City's ordinances require the homeowner to secure from the City an inspection and issuance of a rental Certificate of Occupancy.   The City's ordinance also mandates a re-inspection and new Certificate of Occupancy every three years.

45.     Regardless of the length of occupancy by a tenant, the City's rental inspection and occupancy ordinances have been historically applied and enforced by the City in an identical manner.

46.     In other words, over the course of many years, the City has affirmatively approved the use of homes as short-term rentals under the same regulatory framework utilized for the approval of long-term rentals.   Short-term rentals and long-term rentals were inspected

and approved by the City in an identical manner.

47.     In accordance with the City's ordinances, Plaintiffs have successfully secured inspection approvals and rental Certificates of Occupancy from the City for all of Plaintiffs' Properties for their use as short-term rentals.

48.     In reliance on the approvals granted by the City for the use of Plaintiffs' Properties as short-term rentals, Plaintiffs have made significant financial investments in the properties and contracted with third-parties such as Airbnb for the marketing and booking of the properties for short-term rental use.

49.     The significant financial investments made by Plaintiffs in preparation for the use of Plaintiffs' Properties as short-term rentals include interior renovations to kitchens, bathrooms, bedrooms, living rooms and furnishings and exterior improvements to meet the market standards expected of short-term rental properties and mandated by industry standards established by third-parties such as Airbnb.

50.     Based on the foregoing, Plaintiffs possess a vested protected property interest in the continued use of Plaintiffs' Properties for short-term rentals.

C.  **The City Adopts a Short-Term Rental Ordinance and Threatens Enforcement Against Plaintiffs.**

51.     On July 15, 2025, the City adopted Ordinance No. 25-1845 regulating the use of properties in the City for short-term rentals (hereinafter the "STR Ordinance").

52.     The STR Ordinance specifically defines a short-term rental unit as "[t]he rental of a dwelling unit, either wholly or partly, for compensation for periods of 30 consecutive days or less, by persons other than the permanent resident or owner, and when the permanent resident or owner has obtained a short-term rental permit issued by the Director or their designee."   STR Ordinance at §1.03.

11

53.     Among other restrictions, the STR Ordinance bans the use of any properties in the City for short-term rentals unless the property is located in the area of the City zoned BD, Downtown Business District.

54.     Plaintiffs' Properties are not located in the BD, Downtown Business District zoning district, so the STR Ordinance if enforced would effectively ban the use of all of Plaintiffs' Properties as short-term rentals.

55.     The purported basis for the ban by the City of short-term rentals in all zoning districts other than the BD, Downtown Business District is that occupants of certain short-term rental units created nuisance conditions that were incompatible with residential neighborhoods.

56.     However, the City's ordinance includes provisions that prohibit property owners from maintaining nuisance conditions (e.g., noise restrictions in Ordinance §§13.41, *et seq.*) and provide legal recourse for the City to abate any such nuisances.

57.     Despite the existence of ordinances that provide the City with adequate legal tools to abate any nuisance conditions that may exist at certain short-term rental properties, the City instead adopted an outright ban on all short-term rentals in residential zoning districts.

58.     The City's total exclusion of all short-term rentals on properties located in residential zoning districts through the adoption of the STR Ordinance is arbitrary and capricious.

59.     In addition, the City has informed Plaintiffs that it intends to enforce the STR Ordinance against Plaintiffs' Properties to ban future short-term rental use of such properties.

60.     The City's threatened enforcement of the STR Ordinance to ban all future use of Plaintiffs' Properties as short-term rentals unlawfully disregards Plaintiffs' vested protected property interest in the continued use of Plaintiffs' Properties for short-term rentals.

### D. The STR Ordinance Will Harm Plaintiffs.

61.     The prior use of Plaintiffs' Properties as a rental property for long-term tenants has resulted in much greater vacancy rates, frequent eviction actions due to non-payment of rent by tenants, property damage, and lower rental rates.in comparison to short-term rentals.   As a result, the use of Plaintiffs' Properties as short-term rentals is much more profitable than long-term rentals, and the STR Ordinance unlawfully deprives Plaintiffs of that valuable property right.

62.     If the City enforces the STR Ordinance against Plaintiffs' Properties, Plaintiffs would also be forced to cancel existing bookings, decline new booking inquiries and remove their short-term rental listings with third-parties such as Airbnb, absent appropriate injunctive relief.

63.     In light of the arbitrary and capricious adoption of the STR Ordinance and the blatant uncompensated appropriation of Plaintiffs' fundamental rights to lease and to include, Plaintiffs assert the following claims for relief against the City.

### COUNT I

### Due Process

64.     Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

65.     Under the 14th Amendment to the United Staes Constitution, no State may "deprive and person of life, liberty or property without due process of the law."

66.     The purported justification for the STR Ordinance is that short-term rental units are incompatible with and will constitute a nuisance in all residential neighborhoods.

67.     Without specifically stating as such, through the adoption of the STR Ordinance,

13

the City has in effect declared all short-term rental units to be a public nuisance in residential neighborhoods.

68.     However, the City cannot simply ban a legitimate land use by merely asserting that it is a public nuisance without any proof. A bare assertion, unsupported by factual findings or proof, does not satisfy basic Constitutional Due Process requirements.

69.      "It is a doctrine not to be tolerated in this country, that a municipal corporation, without any general laws either of the city or of the State, within which a given structure can be shown to be a nuisance, can, by its mere declaration that it is one, subject it to removal by any person supposed to be aggrieved, or even by the city itself. This would place every house, every business and all property of the city, at the uncontrolled will of the temporary local authorities." *Yates v. Milwaukee*, 77 U.S. 497, 505 (1870); *see also Cnty. Comm'n v. Nat'l Grid NE Holdings 2 LLC*, Civ. Action No. 2:21-cv-00307, 2022 U.S. Dist. LEXIS 170838, at *36-*44 (S.D. West Va. Sept 21, 2022) (applying *Yates* to reject the municipality's argument that it could declare "open dumps" to be "public nuisances" without reference to whether such conditions would be a public nuisance under common law, despite a state statute authorizing municipalities to enact ordinances to abate "anything which the commission determines to be a public nuisance.")

70.     There is no rational basis for Defendant to effectively classify **_all_** short-term rentals as   public nuisances in all residential neighborhoods in the City.

71.     Defendant cannot, consistent with Due Process, arbitrarily and capriciously ban Plaintiffs' legitimate protected property interests in the continued use of Plaintiffs' Properties as short-term rentals.

72.     Likewise, Defendants cannot, consistent with Due Process, impose such a burden all other current and future property owners in the City on the basis of potential nuisance

14

conditions that may exist and which can be effectively remedied by the City through enforcement of its nuisance abatement ordinances.

**WHEREFORE**, Plaintiffs respectfully pray for the entry of a Judgment against Defendant City of Dearborn, and for a declaration that the STR Ordinance is void and unenforceable, and for preliminary and permanent injunctive relief to prevent its enforcement and mandate its repeal and to prevent the City from arbitrarily enacting future restrictions on Plaintiffs' businesses without Due Process, and for such other and further relief as is just, including just compensation and an award for Plaintiffs' reasonable attorneys' fees and costs.

## COUNT II

### (*Per Se* Takings)
### Takings Clause of the Fifth Amendment to the U.S. Constitution
### 42 U.S.C. § 1983

73.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

74.    The Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Fifth Amendment's prohibition on taking private property for public use without just compensation applies to the states and local governments through the Fourteenth Amendment to the U.S. Constitution. U.S. Const. amend. XIV.

75.    As the Supreme Court has long explained, "[b]y requiring the government to pay for what it takes, the Takings Clause saves individual property owners from bearing 'public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Sheetz*, 601 U.S. at 273-74 (quoting *Armstrong*, 364 U.S. at 49).

76.    The Takings Clause's protections are triggered by *per se* takings and regulatory

15

takings.

77.     *Per se* takings occur whenever government interference with property effects "a direct government appropriation or physical invasion of private property." *Lingle v Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). For *per se* takings, "the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery*, 594 U.S. at 147.

78.     The test in the regulatory-takings context, by contrast, involves balancing several "factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id.* at 148.

79.     But the *Penn Central* balancing test has "no place" when the government "appropriates the enjoyment of third parties" "a fundamental element of the [owners'] property right," *id.* at 149-50, or "otherwise interfere[s] with [such fundamental] right[s]," *Sheetz*, 601 U.S. at 274. "That sort of intrusion on property rights is a per se taking" that automatically "trigger[s]" the "right to compensation." *Id.*

80.     The STR Ordinance constitutes a *per se* taking, as it appropriates fundamental property rights that owners hold by virtue of their property ownership: the rights to lease their property and to include others on the property on a short-term basis.

81.     The U.S. Supreme Court has also long underscored that "the Constitution protects" "the right to … lease," which is an "essential attribute[] of property," *Terrace*, 263 U.S. at 215, and is one of the "fundamental rights which are the essence of civil freedom," *The Civil Rights Cases*, 109 U.S. at 22.

82.     For homeowners who have previously used their homes as short-term rentals, the loss is particularly stark, as they are losing not only a right inherent in homeownership, but also

16

one that they have actively exercised and that has undeniably vested.

83.    For this reason, the government is not permitted to appropriate the right to lease without an award of just compensation. *See, e.g., United States v. Petty Motor Co.*, 327 U.S. 372 (1946) (formal condemnation action in which the United States sought to utilize a leased building for three years thereby taking the lessee's entire leasehold interest); *United States v. Gen. Motors Corp.*, 323 U.S. 373, 380 (1945) (formal condemnation action in which the United States sought to take occupancy for the remainder of the lessee's lease term); see also *Kohl v. United States*, 91 U.S. 367, 377-78 (1875) (noting that, in a lessee's challenge to a federal condemnation action taking a parcel of land for a courthouse, all owners of estates or interests in the land could seek recovery for the appropriation of their property, but that the court would ascertain the value in one trial proceeding). In other words, like other "essential sticks in the bundle of rights that are commonly characterized as property," the right to lease – a fundamental incident of ownership in its own right – merits the Takings Clause's protections. *Cedar Point Nursery*, 594 U.S. at 150.

84.    The STR Ordinance therefore effects *per se* takings by denying all property owners, like Plaintiffs, the right to lease their own properties.

85.    Plaintiffs intend to continue to lease their properties that they own in the City.

86.    Through the adoption and threatened enforcement of the STR Ordinance, the City has stepped in Plaintiffs' shoes as the property owner to dictate what leasehold interests Plaintiffs may create in the land has prevented them from offering the short-term interests that they would otherwise have decided to create. By commandeering the right to lease and by defining the duration of acceptable leaseholds – the key feature of the leasehold interest itself, *see* Nicholas Spear, *Taking Leases*, 80 U. Chi. L. Rev. 2005, 2016 (2013); 2 Blackstone, *supra*, at 103-04 –

the City has plainly appropriated the right to lease and effected a *per se* taking, which triggers the Takings Clause's protections. *See Cedar Point Nursery*, 594 U.S. at 149-50; *see also, e.g., Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1294 (Fed. Cir. 2008) (explaining that the government effected a *per se* physical taking of the owner's water rights by directing it to construct a fish ladder and by commandeering the water's flow and diverting it toward the fish ladder); *Va. Hosp. & Healthcare Ass'n v. Roberts*, 671 F.Supp.3d 633, 651 (E.D. Va. 2023) )"[T]he government cannot commandeer a professional's service and time for public use without providing a just compensation.").

87.     In addition to appropriating Plaintiffs' right to lease, the STR Ordinance also appropriates Plaintiffs' right to include – a corollary of the right to exclude. *See, e.g., Union Carbide Corp. v. Alexander*, 679 S.W.2d 938, 940 (Tenn. 1984) (explaining that the fundamental "rights associated with the ownership of property" include the core rights and their corollaries – *i.e.*, "the right to refuse to do any of the[m]"). The right to exclude has received renewed attention in takings jurisprudence, as the Supreme Court's recent decision in *Cedar Point Nursery* underscored that the "[t]he right to exclude" is "one of the most reassured rights of property ownership." 594 U.S. at 149 (citing *Merrill, Property and the Right to Exclude, supra*, at 742-73). And the Court as reaffirmed that government regulations that "interfere" with a property owner's exclusion right constitute *per se* physical takings – entitling the property owner to just compensation. *Sheetz*, 601 U.S. at 274.

88.     *Cedar Point Nursery*'s reasoning extends just the same to the right to include, the direct corollary of the right to exclude. Both the right to include and the right to exclude are necessary for property owners to act as gatekeepers of their properties and are thus inseparable from one another. *See, e.g.*, Merrill, *Property and the Right to Exclude, supra*, at 742-43 ("[T]he

right to exclude must encompass … the owner's right to include others."). After all, to say that property owners have a right to "exclude" others from their property is just another way of saying that they have a right to decide which individuals to "include" by granting access to the property. See *id.* at 740 n.37 (explaining that the right to exclude is "more precise[ly]" understood as a "gatekeeper power" involving "the right to determine who has access to particular resources and on what terms").

89.     Thus, just as government interference with the right to exclude effects a *per se* appropriation of a fundamental property right warranting an award of just compensation under the Takings Clause, government interference with the right to include equally constitutes a *per se* taking that also categorically entitles the property owner to just compensation. See *Dolan v. City of Tigard*, 512 U.S. 374, 394 (1994) (noting that a government-mandated easement across the owner's property would interfere with her right to include by causing her to "lose all [her] rights to regulate the time in which the public entered onto the greenway," while simultaneously causing "[h]er right to exclude … [to] be eviscerated").

90.     The STR Ordinance infringes on Plaintiffs' inclusion rights by disallowing Plaintiffs from hosting guests on their properties – the paradigmatic example of exercising the right to include.

91.     Indeed, by preventing property owners in residential neighborhoods throughout the City from offering short-term residencies to paying guests of their choice, the City has destroyed fundamental elements of the vast majority of property owners' rights to include others on their property through the use of the lease in contravention of well-established historical practice.

92.     The City owes just compensation for appropriating this essential stick in

19

Plaintiffs' property rights bundle and thereby effecting a *per se* physical taking.

93.     The STR Ordinance effectuates *per se* takings of Plaintiffs' Properties in violation of the Takings Clause. The City thus has a categorical duty to provide Plaintiffs just compensation.

**WHEREFORE**, Plaintiffs respectfully pray for the entry of a Judgment against Defendant City of Dearborn, and for a declaration that the STR Ordinance is void and unenforceable, and for preliminary and permanent injunctive relief to prevent its enforcement and mandate its repeal and to prevent the City from arbitrarily enacting future restrictions on Plaintiffs' businesses without Due Process, and for such other and further relief as is just, including just compensation and an award for Plaintiffs' reasonable attorneys' fees and costs.

## COUNT THREE

### (Regulatory Takings)
### Takings Clause of the Fifth Amendment to the U.S. Constitution
### 42 U.S.C. § 1983

94.     Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

95.     The Short-Term Rental Ordinance also effects a regulatory taking. As noted above, to determine whether a regulatory taking has occurred, courts balance the factors set forth in *Penn Central*: (1) "[t]he economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." 438 U.S. at 124.

96.     The Supreme Court has made clear that jurisdictions cannot "manipulate[]" or "extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking." *Tyler*, 598 U.S. at 645. Given the well-

established historical pedigree for property owners leasing their properties on a short-term basis and that the right to lease is grounded in Michigan property law, Plaintiffs – like other property owners in Dearborn – would not reasonably expect the City to destroy this longstanding use of one's property by legislative fiat, as it has done with the STR Ordinance.

97.     Plaintiffs' property values will be substantially diminished by the STR Ordinance. The forced transition of Plaintiffs' Properties to longer-term rentals will also result in significant cuts to the income they could obtain by offering short-term rentals at the properties.

98.     This accords with the general experience of property owners who offer short-term rentals precisely because it serves as the principal mechanism for property owners to unlock the full value of their properties. *See* AirDNA, 2023 Short-Term Rental Statistics You Need to Know, *supra* (noting that short-term rentals generated approximately $26,000 in revenue per listing in 2023); Ron Bekkerman, et al., *Research: Restricting Airbnb Rentals Reduces Development*, Harv. Bus. Rev. (Nov. 17, 2021) (finding that, of the sample of properties surveyed, those that could offer short-term rentals "sold for an average 38% more than those" that could not, in part because owners had incentives to invest in improvements), https://tinyurl.com/he7uh6we.

99.     In addition, the government's action is most naturally characterized as effecting a physical invasion of owners' property. As detailed above, the City's action falls squarely within the *per se* takings framework precisely because the STR Ordinance appropriates Plaintiffs' fundamental rights to lease and to include others on the property on a short-term basis, the corollary of the right to exclude.

100.    The STR Ordinance thus effects a regulatory taking, for which Plaintiffs are entitled to an award of just compensation.

101.     But if the STR Ordinance somehow passes muster under the *Penn Central* test, the Supreme Court would have no choice but to revisit that test, which is not actually "ground[ed] … in the Constitution as it was originally understood." *Murr v Wisconsin*, 582 U.S. 383, 419 (2017) (Thomas, J., dissenting); *see also Bridge Aina Le'a, LLC v. Haw. Land Use Comm'n*, 141 S.Ct. 731, 731 (2021) (Thomas, J., dissenting from the denial of certiorari); *First Eng. Evangelical Lutheran Church v. Cnty. Of Los Angeles*, 482 U.S. 304, 340 n.17 (1987) (Stevens, J., dissenting).

**WHEREFORE**, Plaintiffs respectfully pray for the entry of a Judgment against Defendant City of Dearborn, and for a declaration that the STR Ordinance is void and unenforceable, and for preliminary and permanent injunctive relief to prevent its enforcement and mandate its repeal and to prevent the City from arbitrarily enacting future restrictions on Plaintiffs' businesses without Due Process, and for such other and further relief as is just, including just compensation and an award for Plaintiffs' reasonable attorneys' fees and costs.

## COUNT FOUR

### Contracts Clause

102.     Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

103.     Article I, Section 10, Clause 1 of the United States Constitution prohibits states from "impairing the Obligation of Contracts."

104.     Pursuant to its terms, the Ordinance took effect as of January 1, 2026.

105.     The effect of the Ordinance, by banning the occupancy and use of Plaintiffs' Properties for short-term rentals despite the existence of a Certificate of Occupancy for short-term rentals issued by the City for all such properties, is to force Plaintiffs to take down or

"snooze" their listings, refuse booking inquiries and cancel existing reservations for dates beyond January 1, 2026.

106.    The Ordinance interferes with Plaintiffs' existing obligations under its contractual relationships with its short-term rental platforms and future guests, and Plaintiffs will suffer fines and penalties and risk being completely suspended from the short-term rental service should Plaintiffs cancel their future bookings and decline future reservation requests.

107.    Additionally, because the Airbnb Superhost Program requires compliance with certain performance standards, including maintaining a cancellation rate of under 1% of all bookings and responding to over 90% of all inquiries, the STR Ordinance substantially impairs Plaintiffs' contracts with Airbnb, Inc. and other similar internet-based short-term rental platforms.

108.    The STR Ordinance is not justified by a significant or legitimate public purpose. Instead, the STR Ordinance was adopted to address a special interest – to prevent potential nuisance conditions in residential neighborhoods.

109.    The STR Ordinance is not reasonably tailored to achieve that purpose given the existence of the City's ordinances that provide adequate legal recourse for the City to abate any nuisances.

**WHEREFORE**, Plaintiffs respectfully pray for the entry of a Judgment against Defendant City of Dearborn, and for a declaration that the STR Ordinance is void and unenforceable, and for preliminary and permanent injunctive relief to prevent its enforcement and mandate its repeal and to prevent the City from arbitrarily enacting future restrictions on Plaintiffs' businesses without Due Process, and for such other and further relief as is just, including just compensation and an award for Plaintiffs' reasonable attorneys' fees and costs.

## COUNT FIVE

### Violation of Michigan Zoning Enabling Act

110.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

111.    Section 208 of the Michigan Zoning Enabling provides that "[i]f the use of a dwelling, building, or structure or of the land is lawful at the time of enactment of a zoning ordinance or an amendment to a zoning ordinance, then that use may be continued although the use does not conform to the zoning ordinance or amendment."   MCL 125.3208.

112.    The Township adopted the STR Ordinance in July 2025.

113.    Prior to the adoption of the STR Ordinance, Plaintiffs advertised and used Plaintiffs' Properties for short-term rentals.

114.    Plaintiffs' Properties were historically used as short-term rentals pursuant to the approvals granted by the City for such use on all of Plaintiffs' Properties through the inspections and issuance of the rental Certificates of Occupancy.

115.    Given the approval and lawful use of all of Plaintiffs' Properties for short-term rentals prior to the adoption of the STR Ordinance, Plaintiffs possess the right under MCL 125.3208 to continue the use of Plaintiffs' Properties for short-term rentals despite the adoption of the STR Ordinance and without interference by the City through the attempted enforcement thereof.

116.    The City intends to enforce the STR Ordinance against Plaintiffs' Properties absent a declaration from this Court that Plaintiffs possess the right to continue the use of Plaintiffs' Properties for short-term rentals under MCL 125.3208 and the issuance of appropriate injunctive relief against the City to enjoin the enforcement of the STR Ordinance.

**WHEREFORE**, Plaintiffs respectfully pray for the entry of a Judgment against Defendant City of Dearborn, and for a declaration that the STR Ordinance is void and unenforceable as a basis to ban the continued use of Plaintiffs' Properties for short-term rentals under the Michigan Zoning Enabling Act, and for preliminary and permanent injunctive relief to prevent its enforcement and mandate its repeal and to prevent the City from arbitrarily enacting future restrictions on Plaintiffs' businesses without Due Process, and for such other and further relief as is just, including just compensation and an award for Plaintiffs' reasonable attorneys' fees and costs.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: January 8, 2026

Respectfully submitted,
MYERS & MYERS, PLLC

By: */s/ Roger L. Myers*
Roger L. Myers (P49186)
915 North Michigan Ave.
Howell MI 48843
Phone: 517-540-1700
Fax: 517-540-1701
rmyers@myers2law.com
Attorneys for Plaintiffs